[Cite as *State v. Galloway*, 2026-Ohio-2779.]

**IN THE OHIO COURT OF APPEALS**
**FIFTH APPELLATE DISTRICT**
**ASHLAND COUNTY, OHIO**

| | |
|---|---|
| STATE OF OHIO | Case No. 25-COA-017 |
| Plaintiff - Appellee | Opinion And Judgment Entry |
| -vs- | Appeal from the Court of Common Pleas, Case No. 23-CRI-007 |
| WALTER GALLOWAY | Judgment: Affirmed |
| Defendant - Appellant | Date of Judgment Entry: July 20, 2026 |

**BEFORE:** Andrew J. King; William B. Hoffman; Robert G. Montgomery, Judges

**APPEARANCES:** CHRISTOPHER R. TUNNELL, JAMES B. REESE, III, for Plaintiff-Appellee; BRIAN A. SMITH, for Defendant-Appellant.

*King, P.J.*

{¶ 1}   Defendant-Appellant Walter Galloway appeals the July 3, 2025 judgment of conviction and sentence of the Ashland County Court of Common Pleas. Plaintiff-Appellee is the State of Ohio. We affirm the trial court.

Facts and Procedural History

{¶ 2}   On November 21, 2022, a Super 8 Motel employee went to Galloway's room because Galloway remained in his room past his scheduled checkout time and was not answering the phone. The employee cracked open the door and observed Galloway sitting on the end of the bed, slumped over and unconscious with his head between his knees. The employee called 911.

{¶ 3}   Ashland County Sheriff's Deputy Hall was first on the scene. The door of the room was cracked when he arrived, but the security bar was engaged. Hall could not see Galloway breathing and suspected he was dead of an overdose. Hall called for a squad.

{¶ 4}   Once Hall and the paramedics made entry into the room through a second door, paramedics sat Galloway upright in order to assess his condition. As they did, a plastic baggie that was stuck to Galloway's face fell to the floor. Galloway was alive, but moving slowly. Hall picked up the baggie and white powder fell out. The room therefore had to be immediately cleared as the first responders feared fentanyl exposure.

{¶ 5}   Galloway was searched and then loaded into the back of an ambulance for treatment. Ashland County Deputies Duewel, Banks, Detective Kinter, and Captain Sims arrived on the scene.

{¶ 6}   A paramedic came out of the ambulance and told Hall that Galloway said he had money in the room and he wanted it. Hall went back into the room, but did not see any money in plain view. Hall therefore went back out to tell Galloway, but Galloway continued to ask for his money. At Detective Kinter's request, Hall asked Galloway if he could search further. Although Galloway was communicating, he was speaking in whispers. Galloway nodded his head and said yes. Hall therefore believed he had consent to search. He advised Kitner and Banks they had consent, but did not participate in the search. He instead followed Galloway to the hospital. While searching the room for Galloway's money, a bulk amount of fentanyl was found in a trash bag containing Galloway's clothing.

{¶ 7}   On January 12, 2023, the Ashland County Grand Jury returned an indictment charging Galloway with one count of possession of fentanyl, a felony of the first degree and one count of trafficking in fentanyl, a felony of the first degree.

{¶ 8}   Galloway filed a motion to suppress arguing he did not consent to a search of his belongings, or in the alternative, if he did consent, the consent was limited to a search for his money.

{¶ 9}   A hearing was held on Galloway's motion on October 21, 2024 and February 7, 2025. During his closing argument, counsel for Galloway raised Galloway's capacity to consent to the search for the first time. The trial court permitted Galloway to argue capacity in a post-hearing memorandum and the State filed a response. On March 5, 2025, the trial court denied Galloway's motion to suppress on several grounds including valid consent and a lack of standing.

{¶ 10} Galloway elected to proceed to a jury trial which took place on July 1-2, 2025. After hearing the evidence and deliberating, the jury found Galloway guilty as charged. At a later sentencing hearing, the trial court found the two charges merged for the purposes of sentencing. The State elected to proceed to sentencing on count two, trafficking in fentanyl, a felony of the first degree. The trial court sentenced Galloway to 11 to 16.5 years of incarceration.

{¶ 11} Galloway filed an appeal and the matter is now before this court for consideration. He raises two assignments of error as follows:

I

{¶ 12} "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS ALL EVIDENCE IN VIOLATION OF APPELLANT'S RIGHT AGAINST THE UNREASONABLE SEARCHES AND SEIZURES, UNDER THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 14 OF THE OHIO CONSTITUTION."

II

{¶ 13} "APPELLANT'S CONVICTIONS, ON BOTH COUNT ONE AND COUNT TWO OF THE INDICTMENT, WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 14} In his first assignment of error, Galloway argues he did not consent to a search of the hotel room and that he did not have the capacity to consent. He further argues the trial court erred in concluding that he did not have standing to challenge the search because his rental period had expired.

Standard of Review

{¶ 15} Three methods exist to challenge a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning*, 1 Ohio St.3d 19 (1982); *State v. Klein*, 73 Ohio App.3d 486 (1991); *State v. Guysinger*, 86 Ohio App.3d 592 (1993). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *State v. Williams*, 86 Ohio App.3d 37 (1993). Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93

(1994); *State v. Claytor*, 85 Ohio App.3d 623, 620 N.E.2d 906 (1993); *Guysinger,* supra. As the United States Supreme Court held in *Ornelas v. U.S.*, 690, 116 S. Ct. 1657 (1996), "... as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."

{¶ 16}  When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. See *State v. Dunlap*, 73 Ohio St.3d 308, 314 (1995); *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982).

Consent to Search

{¶ 17} Galloway first argues the trial court's finding that he voluntarily consented to the search is not supported by competent, credible evidence. We disagree.

{¶ 18} As noted above, we review such a challenge under a manifest weight standard. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 19} The Fourth Amendment to the United States Constitution and Section 14, Article I, Ohio Constitution, prohibit the government from conducting unreasonable searches

and seizures of persons or their property. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968); *State v. Andrews* (1991), 57 Ohio St.3d 86, 87 (1991).

{¶ 20} Consent to search is a well-established exception to the warrant requirement. No Fourth Amendment violation occurs when an individual voluntarily consents to a search. *United States v. Drayton*, 536 U.S. 194, 207 (2002). In determining voluntary consent, the proper test is whether the totality of the circumstances demonstrates that the consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1983); *State v. Robinette*, 80 Ohio St.3d 234.

{¶ 21} In *Robinette*, the Supreme Court of Ohio held:

> We find *Bustamonte* instructive in defining when permission to search is truly consensual under the totality of the circumstances:
> "[W]hen the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." Id. 412 U.S. at 248-249, 93 S.Ct. at 2059, 36 L.E.2d at 875. *State v. Robinette*, 80 Ohio St.3d 234, 685 N.E.2d 762, 1997-Ohio-343.

{¶ 22} In *State v. Wiegand*, 2017-Ohio-9143, ¶28 (5th Dist.), this court listed six factors to consider when determining the voluntariness of consent:

> (1) [T]he voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

{¶ 23} We note that "[t]he voluntariness of a consent search is a question of fact and will not be reversed on appeal unless clearly erroneous." *State v. Bickel*, 2007-Ohio-3517, ¶24 (5th Dist.).

Analysis

{¶ 24} This case is somewhat unique as it was Galloway who initiated the search of his hotel room by telling paramedics he wanted the money he had left in the room before he was transported to the hospital. Transcript of suppression hearing volume 1 (TS1) 19-20. Deputy Hall therefore reentered the room, but did not see any money in plain view. TS1 21. At that point other officers had arrived on the scene. Detective Kinter asked Hall to talk to Galloway again and ask if they had permission to further search the room. TS1 24-25 and Transcript of suppression hearing volume 2 (TS2) 24. Hall's body camera was not running when he spoke with Galloway, however he testified that upon the second conversation,

Galloway nodded his head and whispered "yes." TS1 24. Galloway was also still asking about his money. Id.

{¶ 25} While Hall's body camera was not running, Duewel's was. Duewel was standing near the side door of the ambulance while Hall spoke with Galloway, however, Galloway's responses cannot be heard or seen on Deuwel's body camera footage. Galloway acknowledges this fact.

{¶ 26} Galloway argues he did not consent, but rather said "nah, nah, nah." He bases this assertion on Duewel's body camera footage from when Duewel reported back to Detective Kinter as to what Galloway had told Hall. While Galloway offers his own interpretation of what Duewel told other officers following Hall's conversation with Galloway, Duewel's conversation with other officers is unintelligible on his body camera footage. Indeed, even the trial court indicated it had "reviewed that portion of the video multiple times, using headphones and playing it at full volume, and does not hear "no, no, no." Judgment Entry, March 5, 2025 at 4, docket item 121. During the suppression hearing, Duewel was unable to recollect what he said or whether he was repeating what Galloway said or what Hall said. TS2 49-51. Detective Kinter, however, testified that Hall unequivocally reported to him that Galloway has given consent to search the room and this is what he relied upon before searching the room. TS2 56-57.

{¶ 27} Due to the poor audio quality of Duewel's body camera, the trial court looked to the testimony presented at the hearing and found the testimony of Hall and Kinter to be "entirely credible." Judgment Entry, supra at 5. Deputy Hall and Detective Kinter's credibility were a matter for the trial court to determine and we find no error in the trial court's factual

findings. This is not, therefore, an exceptional case in which the evidence weighs heavily against the trial court's decision that Galloway consented to the search of the hotel room.

{¶ 28} Next Galloway argues he did not have the capacity to consent to the search due to intoxication. The voluntariness of consent to search is defined by whether the defendant's "will has been overborne and his capacity for self-determination critically impaired . . .." . *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). To determine whether a defendant's will was overborne in a particular case, a court is to consider the totality of all surrounding circumstances. Id. at 226-227. Here, as noted by the trial court, Galloway had the wherewithal to respond to officers appropriately, to provide his identifying information, voice his concern about his money and ask officers to find it, explain to officers and paramedics what he had done prior to the hotel manager calling 911 including calling his children and calling the front desk, and identifying the drugs found in the hotel room. State's exhibit 1.

{¶ 29} Finally, even if none of the foregoing were true, we ultimately agree with the trial court's conclusion that Galloway lacked standing to challenge the search because his rental period had expired.

{¶ 30} During the suppression hearing, Bobby Patel, the hotel manager, testified that Galloway's checkout time was 11:00 a.m. on November 21, 2022. When the housekeepers went to clean Galloway's room on that date and at that time, they received no response when they knocked at the door. Patel tried calling Galloway's room, but also received no response. Galloway never advised Patel that he desired to stay another night before checkout time. TS1, 9-11. Thus, Galloway's rental period expired at 11:00 a.m. on November 21, 2022. There is no dispute that officers entered and searched the room and Galloway's belongings well after 11:00 a.m.

{¶ 31} The expectation of privacy in a hotel room and articles therein expire upon the expiration or termination of the rental period. *State v. Montgomery*, 2000 Ohio App. LEXIS 1339 (M.C. 2000), citing *State v. Hall*, 66 Ohio Misc. 2d 80, 83, 643 N.E.2d 190 (1994), *United States v. Rahme*, 813 F.2d 31, 34 (C.A.2, 1987) (once a guest's rental period has expired, the guest "does not have a legitimate expectation of privacy in the hotel room or in any article therein of which the hotel lawfully takes possession."); *United States v. Huffhines*, 967 F.2d 314, 318, (C.A.9, 1992) (a guest has no expectation of privacy once the rental period of the motel room has expired),*United States v. Parizo* (C.A.2, 1975), 514 F.2d 52, 54-55 (a guest's right to privacy in a motel room expires when the term of the occupancy expires; at that point the manager of the motel has the right to enter the room and to consent to a search); *United States v. Cowan*, 396 F.2d 83, 86-87 (C.A.2, 1968) (guest lost right to privacy in room and luggage left in room when he failed to pay for room for five days); *United States v. Larson*, 760 F.2d 852, 854 (C.A.8, 1985) (although the guest intended to continue his occupancy in the rented motel room, he lacked a reasonable expectation of privacy upon remaining in room beyond the occupancy period without paying for the next day's rent).

{¶ 32} Galloway argues his rental period had not yet expired because Patel testified that if Galloway had paid for another night, he would have been free to stay another night. The argument is nonsensical and contradicted by *Larson*, supra. The record is clear that Galloway failed to pay for another night before 11:00 a.m. and never indicated that was his intention to stay any longer. Galloway therefore lacked standing to challenge the search.

{¶ 33} The first assignment of error is overruled.

II

{¶ 34} In his final assignment of error, Galloway argues his convictions are against the manifest weight of the evidence. Specifically, Galloway argues the weight of the evidence failed to establish that he was in actual or constructive possession of the fentanyl found in the hotel room, the State failed to produce typical evidence of trafficking such as scales or baggies, and did not test the drug packaging for DNA. We disagree.

Standard of Review

{¶ 35} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

Possession

{¶ 36} R.C. 2925.01(K) defines "possession" as "having control over a thing or substance," though it cannot be inferred solely from access to the premises where the item is found. Under R.C. 2901.21(D)(1), possession is a voluntary act if the person knowingly procured or received the item or was aware of having control of it for a sufficient time to end the possession.

{¶ 37} Possession may be actual or constructive. *State v. Butler*, 42 Ohio St.3d 174, 176 (1989); *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus. Constructive possession

exists when the defendant can exercise dominion or control over the contraband, even if it is not in his immediate physical possession. *State v. Wolery*, 46 Ohio St.2d 316, 332 (1976). Dominion and control may be proven by circumstantial evidence, including proximity to the contraband. *State v. Trembly*, 137 Ohio App.3d 134 (8th Dist. 2000); *State v. Barr*, 86 Ohio App.3d 227, 235 (8th Dist. 1993); *State v. Morales*, 2005-Ohio-4714, ¶ 50 (5th Dist.). Ownership of the contraband is unnecessary to establish constructive possession, and multiple individuals may share constructive possession simultaneously. *Wolery*, 46 Ohio St.2d at 332; *State v. Pitts*, 2000-Ohio-1986 (4th Dist.).

{¶ 38} Circumstantial evidence is defined as "'testimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved.'" *State v. Nicely*, 39 Ohio St.3d 147,150 (1988), quoting Black's Law Dictionary (5th Ed. 1979).

{¶ 39} If the state relies on circumstantial evidence to prove an essential element of an offense, it is not necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenks*, 61 Ohio St. 3d 259, 272, (1991) at paragraph one of the syllabus. "Circumstantial evidence and direct evidence inherently possess the same probative value [.]" *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks*, 61 Ohio St. 3d at 272.

## The Evidence

{¶ 40} The State provided ample direct evidence to demonstrate Galloway was in actual possession of the fentanyl. First, Galloway was discovered passed out with a baggie of white powder on his person which fell to the floor when EMS technicians moved his body to render aid. Next, Detective Kinter interviewed Galloway following his arrest. Galloway confessed that the fentanyl found in the hotel room belonged to him. As to Galloway's complaint that there was no evidence of trafficking such as scales and baggies, Galloway also admitted that he stole his drug dealer's fentanyl supply but was selling what he stole to support himself. In fact, counsel for Galloway admitted in opening statement that Galloway stole the drugs. Transcript of trial (T.) at 73. Galloway additionally stated he believed someone he sold drugs to also stole $300-500 he had in his possession after he passed out. Text messages on Galloway's phone suggested his dealer was looking for him as a result of the theft, and Galloway told hotel management to deny he was staying there if anyone asked. T. at 115, 117, 124, 132-137; State's exhibits 1 and 42. While no DNA testing was conducted on the drug packaging, no DNA evidence is required to support a conviction or possessing or trafficking drugs. Moreover, when, as here, the defendant admits the drugs in question belong to him, DNA testing is unnecessary.

{¶ 41} Upon thorough review of the record and the applicable law, we conclude that the State presented abundant evidence, from which a rational jury could weigh the evidence and all reasonable inferences, consider the credibility of witnesses and conclude that Galloway both possessed and trafficked fentanyl. We further conclude that this is not an exceptional case in the evidence weighs heavily against the conviction. Accordingly, Galloway's final assignment of error is overruled.

{¶ 42} The judgment of the Ashland County Court of Common Pleas is affirmed. Costs to Appellant.

By: King, P. J.

Hoffman, J. and

Montgomery, J. concur.